*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
January 14, 2021

Plaintiff-Appellee,

v

No. 350527
Ingham Circuit Court
LC No. 18-000479-FH

WILLIAM DERKLEY STRAMPEL,

Defendant-Appellant.

Before: GADOLA, P.J., and BORRELLO and M.J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his conviction after a jury trial of misconduct in office by a public official, MCL 750.505.[1]  Defendant was sentenced to serve 11 months incarceration.  We affirm.

## I.  FACTS

This case arises from allegations that defendant used his position as dean of Michigan State University's College of Osteopathic Medicine (COM) to sexually exploit female students.  At the preliminary examination, the prosecution presented witnesses who were either current or former students at the COM.  Each of these witnesses testified that while at the COM she found herself facing an academic problem or deficiency that could derail her progress; to address the problem or deficiency, each met privately with defendant to discuss her situation.  Each witness testified that defendant made inappropriate sexual comments during the meeting, and several testified that

---

[1] Defendant also was convicted of two counts of willful neglect of duty by a public officer, MCL 750.478, for failing to properly oversee doctor Larry Nassar, then under defendant's authority at the COM, and for permitting Nassar to return to work before completion of the Title IX investigation of an allegation that Nassar engaged in sexual misconduct.  Defendant does not challenge those convictions on appeal.

-1-

they understood defendant's comments to be an offer of a quid pro quo of granting the student the requested academic relief in exchange for sexual favors.

Specifically, LJ, a student at the COM beginning in 2015, testified that she met with defendant in June 2017 because she had not received the necessary grade on a test to qualify for a national board certification exam. According to LJ, at the outset of the meeting defendant immediately denied her request, then told her that he knew of women her age who "put out" for older men and received gifts such as money, travel, and jewelry. According to LJ, defendant also brought up the topic of sending nude photos electronically. LJ testified that defendant also stated that he thought she had danced on tables at an East Lansing nightclub.

AF, a third-year COM student, testified that she met with defendant in his office to request a waiver to take an examination. According to AF, defendant immediately denied her request for a waiver, then told her about a female medical student who had been charged with drunken driving, and that it was rumored that the reason the student was not expelled was that she "gave him a blow job." According to AF, after telling this story defendant asked her "what do you think about that?" After AF expressed her confusion, defendant clarified that he meant that he had ended that student's career for spreading the rumor, but then said, "You'd be surprised what people would be willing to do put in stressful situations." In September 2017, AF again met with defendant to request special consideration to begin her clinical rotation as a third-year COM student while preparing to take a certification examination. Defendant agreed to have AF begin her clinical rotations if she agreed to withdraw from the COM if she failed the examination; according to AF, defendant told her, "If you do not pass, worse comes to worse, . . . we'll see what kind of mood I'm in on that day."

JN testified that she was a student at the COM in 2013-2014, during which time she met with defendant to discuss an incident involving a male student that occurred during her surgical clinical rotation. JN testified that when she arrived at defendant's office he told her to turn around twice slowly so that he could look at her, then stated, "What do I need to do to teach you how to be submissive and subordinate to men?" JN testified that defendant warned her that he could destroy her career. JN further testified that in June 2014, while attending a dinner in honor of students who had received scholarships, defendant grabbed her buttocks as she posed for a photograph with the donor of the scholarship and defendant.

After a preliminary examination, the district court bound defendant over to the trial court on one count of misconduct in office by a public official, MCL 750.505, two counts of willful neglect of duty, MCL 750.478, and second-degree criminal sexual conduct (CSC), MCL 750.520c. Before the trial court, defendant moved to quash the bindover on the charge of misconduct in office by a public official, contending that under the test set forth in *People v Freedland*, 308 Mich 449, 457-458; 14 NW2d 62 (1944), and *People v Coutu*, 459 Mich 348; 589 NW2d 458 (1999), as dean of the COM he was not a public officer and, therefore, not subject to the crime of misconduct in office. The trial court denied defendant's motion to quash the bindover, finding that defendant was a public officer under the test set forth in *Freedland* and that the district court therefore did not abuse its discretion by binding defendant over on the charges.

At trial, the prosecution presented additional testimony, including that of two female undergraduate students who testified that defendant suggested they participate at the COM as

clinical skills models. The position entailed the student permitting medical students to perform examinations as part of the medical students' training, including breast exams and pelvic exams. Typically, clinical skills models were required to participate in a standardized vetting process through the university, including informed consent, interviews, and payment of the student through the university. Defendant, however, recruited the two students personally without the students being vetted and hired through the university. One of the students testified that defendant performed a breast exam and pelvic exam on her privately in an examination room, then paid her with cash from his wallet. The other student testified that she participated in about 10 examinations, some of which were conducted by defendant and the others conducted by medical students. After the examinations, defendant paid her in cash and often took her out for dinner and alcoholic drinks. The student testified that during one such dinner, defendant told her that recently he had permitted the medical students to examine her because it gave him an erection when he examined her himself. On one occasion, defendant invited her to watch while he volunteered to be the male clinical model, which entailed him undergoing an extensive examination by one of his students while unclothed.

At the conclusion of trial, the jury found defendant guilty of misconduct in office by a public official, MCL 750.505, and two counts of willful neglect of duty, MCL 750.478. The jury acquitted defendant of the charge of second-degree CSC. Defendant now appeals, challenging only his conviction of misconduct in office by a public official.

## II. DISCUSSION

Defendant contends that, as the dean of the COM, he was not a public officer and therefore could not be convicted of misconduct in office. Defendant argues that the trial court erred by determining that he was a public officer, and therefore abused its discretion by failing to quash the district court's bindover on the charge of misconduct in office. We disagree.

## A. STANDARD OF REVIEW

We review de novo whether defendant was a public officer, which is a question of law. See *People v Bruce*, 504 Mich 555, 562; 939 NW2d 188 (2019) (opinion by CAVANAGH, J.). The interpretation and application of statutes also are questions of law that we review de novo. *Id*. A reviewing court will not disturb a district court's bindover decision absent an abuse of the district court's discretion. *People v Anderson*, 501 Mich 175, 182; 912 NW2d 503 (2018). Similarly, we review a trial court's decision regarding a motion to quash an information for an abuse of discretion. *People v Zitka*, 325 Mich App 38, 43; 922 NW2d 696 (2018). "A trial court necessarily abuses its discretion when it makes an error of law." *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation marks and citation omitted). To the extent that a trial court's decision on a motion to quash an information is based on an interpretation of the law, our review is de novo. *Zitka*, 325 Mich App at 44.

## B. MISCONDUCT IN OFFICE

Defendant was convicted of misconduct in office under MCL 750.505, which provides:

Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state,

-3-

shall be guilty of a felony, punishable by imprisonment in the state prison not more than 5 years or by a fine of not more than $10,000.00, or both in the discretion of the court.

The offense of misconduct in office is a common-law crime, and is defined as "corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office." *People v Waterstone*, 296 Mich App 121, 133; 818 NW2d 432 (2012) (quotation marks and citations omitted). At common law, a public officer could be convicted of misconduct in office "(1) for committing any act which is itself wrongful, malfeasance, (2) for committing a lawful act in a wrongful manner, misfeasance, or (3) for failing to perform any act that the duties of the office require of the officer, nonfeasance." *People v Perkins*, 468 Mich 448, 456; 662 NW2d 727 (2003). When the acts alleged "demonstrate a tainted or perverse use of the powers and privileges granted to the officer," the allegations are sufficient to support a charge of misconduct in office. *People v Milton*, 257 Mich App 467, 471; 668 NW2d 387 (2003).

To prove the offense of misconduct in office, the prosecution must demonstrate that (1) the defendant was a public officer, (2) the misconduct occurred in the defendant's exercise of the duties of the public office or under color of office, and (3) the misconduct constitutes corrupt behavior. *Id*. Here, defendant challenges only the first element, arguing that as the dean of the COM he was not a public officer.

In *Freedland*, our Supreme Court identified five "indispensable" elements to demonstrate a "public office of a civil nature." *Bisio v City of Village of Clarkston*, ___ Mich ___, ___; ___ NW2d ___ (2020); slip op at 7 n 9. Those elements are:

(1) It must be created by the Constitution or by the legislature or created by a municipality or other body through authority conferred by the legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the legislature or through legislative authority; (4) the duties must be performed independently and without control of a superior power other than the law, unless they be those of an inferior or subordinate office, created or authorized by the legislature, and by it placed under the general control of a superior officer or body; (5) it must have some permanency and continuity, and not be only temporary or occasional. [*Freedland*, 308 Mich at 457-458 (quotation marks and citation omitted).]

In *Bruce*, our Supreme Court observed that in its earlier opinion in *Freedland*, the Court quoted these five factors, but also noted other considerations, thereby suggesting that the five factors are not the exclusive considerations for determining a public officer. See *Bruce*, 504 Mich at 564, citing *Freedland*, 308 Mich at 457-458. Specifically, our Supreme Court in *Freedland* stated that oath and bond requirements are also considerations when determining whether a defendant is a public officer. *Freedland*, 308 Mich at 458. The Court in *Bruce* explained that the factors identified in *Freedland*, although sometimes referred to as "indispensable," have not been applied by that Court as essential elements, each one of which is individually necessary to establish that a defendant was a public officer. *Bruce*, 504 Mich at 564 n 3. The Court in *Bruce* acknowledged that after *Freedland*, the Court in *Coutu* carried over the phrase "five indispensable

elements," from the discussion in *Freedland*, but observed, "that is not how the test was applied" in *Freedland*. *Id*. Instead, the Court in *Freedland* treated the factors as considerations, but not essential elements of a test. *Id*.

However, although the Court in *Bruce* suggested that the *Freedland* factors were not elements of a test, each of which must be established to prove that a defendant is a public officer, but rather factors to be considered, the Court in *Bruce* did not specifically resolve that question. Rather, the Court in *Bruce* determined that because in that case all five factors had been met, resolution of the question in that case was unnecessary. *Id*.

Here, defendant contends that all five factors stated in *Freedland* must be met to support the conclusion that he was a public officer, and that in this case the prosecution failed to establish the first and fourth factors set forth in *Freedland*. As in *Bruce*, however, we need not resolve in this case whether establishing fewer than all of the *Freedland* factors will suffice to demonstrate that defendant was a public officer because consideration of all five factors supports the conclusion that defendant was, in fact, a public officer. See *Bruce*, 504 Mich at 654 n 3. Briefly stated, we conclude that (1) the Legislature created the office of dean of the COM, (2) the office was delegated a portion of the sovereign power of the government, (3) the powers and duties of the office are defined through legislative authority, (4) the office exercises duties under the general control of the board of trustees of MSU, and (5) the office has permanency and continuity.

To elaborate, the first factor provides that a public office "must be created by the Constitution or by the legislature or created by a municipality or other body through authority conferred by the legislature." MCL 390.661 is part of 1969 PA 162, which established a state school of osteopathic medicine. MCL 390.661 provides:

> A school of osteopathic medicine is established and shall be located as determined by the state board of education at an existing campus of a state university with an existing school or college of medicine. The school must be headed by an osteopathic physician serving as the dean of the school of osteopathic medicine. The dean shall be responsible for the development and maintenance of the school in osteopathic medicine. The school shall be maintained by the state and its facilities shall be made equally available and on the same basis to all qualified residents of this state. Clinical services in osteopathy shall be given chiefly in affiliated osteopathic hospitals. The conduct of the affairs of the school shall be vested in the board of control of the institution of higher education to which the school is assigned.

Thus, in addition to establishing a school of osteopathic medicine, MCL 390.661 also provides that the school must be headed by an osteopathic physician serving as the dean of the school and that the dean shall be responsible for the development and maintenance of the school. The statute also vests the board of control of the institution of higher education to which the school is assigned with the conduct of the affairs of the school. MCL 390.661.

Defendant argues that MCL 390.661 did not create the position of dean, and instead only imposed a credentialing requirement, specifically, that the dean be an osteopathic physician. Defendant contends that the position of dean of the school instead was created by the various

boards, bylaws, and offices within Michigan State University (MSU).[2] Our primary task when interpreting a statute is to discern and give effect to the intent of the Legislature. *People v Peltola*, 489 Mich 174, 181; 803 NW2d 140 (2011). In doing so, we first consider the language of the statue; if it is unambiguous, we conclude that the Legislature intended the clearly expressed meaning and enforce the statute as written. *Id.* The use of the term "shall" in statutory language specifies a mandatory directive, *Ellison v Dep't of State*, 320 Mich App 169, 180; 906 NW2d 221 (2017), as does the term "must." *Vyletel-Rivard v Rivard*, 286 Mich App 13, 25; 777 NW2d 722 (2009).

By enacting MCL 390.661, the Legislature created both the school of osteopathic medicine and the dean of the school; the unambiguous language of the statute explicitly provides for the creation of a school of osteopathic medicine to be maintained by the state, and explicitly requires that the school be headed by a dean who is an osteopathic physician. The unambiguous language of the statute further explicitly provides the dean with specific responsibility for the development and maintenance of the school of osteopathic medicine and vests the conduct of the affairs of the school of osteopathic medicine in the board of control of the university to which the school of osteopathic medicine is assigned. Because the statute unambiguously created the position of dean of the COM, this factor was established.

Defendant does not contest that the second factor, that the position has been delegated a portion of the sovereign power of government to be exercised for the benefit of the public, was demonstrated. MCL 390.616 broadly charges the dean of the COM to maintain the school for the benefit of the public, making it available to the qualified residents of this state. To accomplish this, the statute directs the dean of the school to develop and maintain the school. MCL 390.616. The second factor therefore was established.

Defendant also does not contest the third factor, that the powers and duties assigned to the office be defined, either directly or impliedly, by the legislature or through legislative authority. Because MCL 390.661 broadly provides that "the dean shall be responsible for the development and maintenance of the school in osteopathic medicine," this factor also was established.

Defendant challenges the fourth factor, which provides that "the duties must be performed independently and without control of a superior power other than the law, unless they be those of an inferior or subordinate office, created or authorized by the legislature, and by it placed under the general control of a superior officer or body." Although defendant agrees that the position of dean of the COM is under the general control of MSU's board of trustees, he argues that the duties

---

[2] Defendant's counsel at oral argument contended that because the university possessed independent authority to create a COM along with the position of dean of such a college under its general grant of constitutional autonomy, Const 1963, art 8, § 5, the position defendant occupied was not created under a grant of legislative authority. This ignores the fact that the Legislature statutorily authorized the COM and created the position of dean, neither of which existed before the statutory enactment, and that MSU was awarded the college under that legislative authorization.

of the dean are not those of a subordinate office created by the Legislature and placed under the control of the board of trustees.

MCL 390.661 created the office of the COM dean and provides that "[t]he conduct of the affairs of the school [of osteopathic medicine] shall be vested in the board of control of the institution of higher education to which the school [of osteopathic medicine] is assigned." The position of dean of the COM is therefore an inferior or subordinate office placed under the general control of a superior officer or body, being the MSU Board of Trustees. As the trial court observed:

> [W]hile the Defendant focuses on the first part of that element, and has spent much of the briefing showing how the Dean is actually not a position that's performed independently and without control of a superior power, the Defendant ignores the second part of the element which is that it may also be satisfied if the individual assuming the duties of an inferior or subordinate office is placed under the general control of a superior officer or a body.
>
> So, under this alternative portion of that element the *Coutu* court, the Michigan Supreme Court, ruled that deputy sheriffs were public officials because their positions were both authorized by statute, and the positions were inferior or subordinate to the sheriff. Here the Dean of the College of Osteopathic Medicine is a position . . . authorized by statute MCL 390.661 and it is, per the Defendant's own argument, placed under the general control of a superior body, that superior body being the Board of Trustees. So, specifically under MCL 390.661 the Dean is responsible for the development and maintenance of the College of Osteopathic Medicine and under that statute the conduct of the affairs of the College of Osteopathic Medicine is vested in the Board of Trustees.

As the trial court reasoned, similar to the position of deputy sheriff, which our Supreme Court observed was authorized by the Legislature as an inferior office of the sheriff, *Coutu*, 459 Mich at 355, the position of dean of the COM, whose duty it is to develop and maintain the school, is legislatively authorized as an inferior office to the board of trustees.[3] Accordingly, the fourth factor was established.

Defendant does not contest the fifth factor, that the office have permanency and continuity. MCL 390.661 mandates the office of dean of the COM, and there is no suggestion that the office is other than permanent and continuous. Accordingly, the fifth factor is established.

"The idea that people who wield the power of the state are required to do so responsibly is not new." *Bruce*, 504 Mich at 563. Here, defendant, in the position of dean of the COM, was a public officer for purposes of the charge of misconduct in office. The trial court therefore correctly

---

[3] In *Coutu*, the Court reasoned that although deputy sheriffs do not operate without a superior control other than the law, they are under the control of the sheriff, a "superior officer." *Coutu*, 459 Mich at 355.

determined that the district court did not abuse its discretion by binding defendant over to the trial court based upon that determination of law.

Affirmed.

/s/ Michael F. Gadola
/s/ Stephen L. Borrello
/s/ Michael J. Kelly